[Cite as *State v. Boyd*, 2023-Ohio-2079.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO                        :
                                     :
        Appellee                     :   C.A. No. 29447
                                     :
v.                                   :   Trial Court Case No. 2021 CR 00017/1
                                     :
LAMON BOYD                           :   (Criminal Appeal from Common Pleas
                                     :   Court)
        Appellant                    :
                                     :

. . . . . . . . . . .

O P I N I O N

Rendered on June 23, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

LUCAS W. WILDER, Attorney for Appellant

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Lamon Boyd appeals from his convictions in the Montgomery County Common Pleas Court following his no contest pleas. Boyd challenges the trial court's decisions overruling his motion to dismiss on speedy trial grounds and overruling his motions to suppress. For the following reasons, we affirm the judgment of the trial court.

## I. Procedural History

{¶ 2} On January 12, 2021, Boyd was indicted on two counts of trafficking in persons (compulsion to involuntary servitude), in violation of R.C. 2905.32(A), felonies of the first degree; one count of aggravated possession of drugs (100 times bulk or more), in violation of R.C. 2925.11(A), a felony of the first degree; one count of corrupting another with drugs (juvenile)(Schedule I or II), in violation of R.C. 2925.02(A)(4)(a), a felony of the second degree; three counts of having weapons while under disability (prior offense of violence), in violation of R.C. 2923.13(A)(2), felonies of the third degree; one count of aggravated menacing, in violation of R.C. 2903.21(A), a misdemeanor of the first degree; one count of assault, in violation of R.C. 2903.13(A), a misdemeanor of the first degree; and one count of sale to underage persons, in violation of R.C. 4301.39(A), an unclassified misdemeanor.

{¶ 3} On January 14, 2021, bond was set at $250,000, and the trial court appointed counsel. A scheduling hearing was set for January 28, 2021; however, Boyd filed a continuance of the hearing until February 10, 2021. On February 5, 2021, a notice of substitution of counsel was filed along with a request for discovery, a motion to preserve evidence, and a demand for a bill of particulars. On February 9, 2021, defense counsel filed a motion to continue until March 4, 2021.

{¶ 4} On March 4, 2021, Boyd filed a motion to suppress evidence obtained as fruits of an unconstitutional search. A motion for a continuance was filed by defense counsel to re-set the March 4, 2021 hearing until April 9, 2021, in order to hold a hearing on the motion to suppress. Shortly thereafter, the trial court scheduled a suppression

hearing for April 29, 2021.

**{¶ 5}** On April 20, 2021, Boyd filed a supplemental motion to suppress and a motion for a *Franks* hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The supplemental motion challenged the validity of a search warrant as well as statements made by Boyd without warnings as required under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**{¶ 6}** At the April 29, 2021 hearing, both parties appeared and requested a continuance of the motion to suppress hearing in order to have all the necessary witnesses present to cover the issues raised in both of Boyd's motions. As a result, the trial court rescheduled the motion hearing to May 14, 2021, at which time a hearing was held. At the conclusion of the State's evidence, defense counsel requested that another hearing date be scheduled in order for defense counsel to subpoena a witness who had not been subpoenaed for the May 14, 2021 hearing date. The trial court agreed, and a hearing was scheduled for June 2, 2021.

**{¶ 7}** On June 2, 2021, the defense witness did not appear, and a continuance of the hearing was granted until June 17, 2021. However, a hearing was held on June 2, 2021, regarding a motion for a modification of bond filed by Boyd. Although a hearing was scheduled for June 17, 2021, the record does not reflect that any hearing was held on that date.

**{¶ 8}** Pursuant to the trial court's briefing schedule, the State filed a response to Boyd's motions on July 20, 2021, and Boyd filed a post-hearing brief in support of his motions on August 6, 2021.

{¶ 9} The case was scheduled for a hearing on September 23, 2021, for the trial court to render a decision on the motion to suppress. However, defense counsel contacted the court and requested that the court "hold off on any decisions" because there were "some plea negotiations" pending between Boyd and the State. Supp. Tr. p. 2.[1] As a result, the trial court agreed to not issue a decision and continued the hearing per defense counsel's request until October 14, 2021.

{¶ 10} No hearing occurred on October 14, 2021, but a scheduling conference occurred on November 10, 2021, at which point a trial date was set for January 31, 2022. The trial court indicated on the record that it would file its decision on the motion to suppress shortly. Supp. Tr. at p. 3. On December 21, 2021, the trial court filed an entry overruling Boyd's motion to suppress in its entirety.

{¶ 11} On January 24, 2022, Boyd filed a motion to dismiss based on a violation of both his statutory and constitutional rights to a speedy trial. The following day, the trial court overruled Boyd's motion orally on the record followed by a written decision. Immediately after his motion was orally overruled, Boyd entered a no contest pleas to the charges as stated in the indictment, except for one count of sale to underage persons, in exchange for an agreed mandatory indefinite prison sentence of 11 years minimum to 16½ years maximum. Sentencing was scheduled for February 17, 2022.

{¶ 12} On January 31, 2022, Boyd filed a motion to withdraw his no contest pleas. Shortly thereafter, Boyd's counsel filed a motion to withdraw, and new counsel was

---

[1] Throughout this opinion, the transcript covering the September 23, 2021 and November 10, 2021 hearings is referred to as "Supp. Tr." and the transcript covering the remaining hearings is referred to as "Hrg. Tr."

appointed. On March 24, 2022, Boyd appeared in open court with new counsel and agreed to withdraw his motion to withdraw his pleas and proceed with sentencing. The trial court ran all counts concurrently and sentenced Boyd to the agreed 11 years minimum sentence up to a maximum of 16½ years in prison. Boyd timely appealed.

## II. Speedy Trial

{¶ 13} In his first assignment of error, Boyd contends that the trial court erred in denying his motion to dismiss for speedy trial violations. He raises statutory and constitutional speedy trial violation arguments, which we will address in turn.

### a. Statutory Speedy Trial

{¶ 14} "The right to a speedy trial is a fundamental right guaranteed by the Sixth Amendment to the United States Constitution, made obligatory on the states by the Fourteenth Amendment. Section 10, Article I of the Ohio Constitution guarantees an accused this same right." *State v. Hughes*, 86 Ohio St.3d 424, 425, 715 N.E.2d 540 (1999). "In Ohio, the right to a speedy trial has been implemented by statutes that impose a duty on the State to bring to trial a defendant who has not waived his right to a speedy trial within the time specified by the particular statute." *City of Cleveland v. Sheldon*, 8th Dist. Cuyahoga No. 82319, 2003-Ohio-6331, ¶ 16. The applicable speedy trial statutes in Ohio for this case are R.C. 2945.71 through R.C. 2945.73.

{¶ 15} R.C. 2945.71(D) provides that when multiple charges of varying degrees arise from "the same act or transaction," the time requirement to be brought to trial on all the charges is within the time period required for the highest degree of offense charged. "R.C. 2945.71(C)(2) provides that a person charged with a felony must be brought to trial

within two hundred and seventy days of arrest." *State v. Stewart*, 2d Dist. Montgomery No. 21462, 2006-Ohio-4164, ¶ 18. "For purposes of calculating speedy-trial time, 'each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days.' * * * Thus, subject to certain tolling events, a jailed defendant must be tried within 90 days." *State v. Ramey*, 132 Ohio St.3d 309, 2012-Ohio-2904, 971 N.E.2d 937, ¶ 15, quoting R.C. 2945.71(E).

{¶ 16} "Speedy-trial provisions are mandatory, and, pursuant to R.C. 2945.73(B), a person not brought to trial within the relevant time constraints 'shall be discharged,' and further criminal proceedings based on the same conduct are barred." *State v. Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, ¶ 7, citing R.C. 2945.72(D). However, "the prescribed times for trial set forth in R.C. 2945.71 are not absolute in all circumstances, but a certain measure of flexibility was intended by the General Assembly by the enactment of R.C. 2945.72, wherein discretionary authority is granted to extend the trial date beyond the R.C. 2945.71 time prescriptions." *State v. Wentworth*, 54 Ohio St.2d 171, 173, 375 N.E.2d 424 (1978). "Accordingly, R.C. 2945.72 contains an exhaustive list of events and circumstances that extend the time within which a defendant must be brought to trial." *Ramey* at ¶ 24. One such reason includes the period of any continuance granted on the accused's own motion. R.C. 2945.72(H). Another circumstance includes "[a]ny period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused." R.C. 2945.72(E).

{¶ 17} "Upon review of a speedy-trial issue, a court is required to count the days

of delay chargeable to either side and determine whether the case was tried within applicable time limits." *Sanchez* at ¶ 8. "A defendant establishes a prima facie speedy trial violation when his motion reveals that a trial did not occur within the time period prescribed by R.C. 2945.71." *State v. Hill*, 2d Dist. Montgomery No. 28411, 2020-Ohio-2958, ¶ 6, citing *State v. Butcher*, 27 Ohio St.3d 28, 31, 500 N.E.2d 1368 (1986). "If a defendant 'establishes a prima facie case of a violation of his right to a speedy trial, the burden then shifts to the State' to demonstrate either that the statutory limit was not exceeded, or that the State's time to bring the defendant to trial was properly extended." *State v. Wagner*, 2d Dist. Miami No. 2020-CA-6, 2021-Ohio-1671, ¶ 12, quoting *State v. Nichols*, 5th Dist. Richland No. 04CA56, 2005-Ohio-1771, ¶ 11, citing *Butcher* at 30-31.

{¶ 18} Boyd was charged with a combination of felony and misdemeanor offenses arising out of the same act or transaction and was held in custody solely on this case. Accordingly, the State had 90 days to bring him to trial. Boyd entered no contest pleas 387 days after his January 2, 2021 arrest (excluding the day of arrest). The State argues that the majority of this time was tolled by Boyd's own actions, and time was tolled during the entirety of the time between the filing of Boyd's motion to suppress and the trial court's issuance of a decision on the motion. Based on these tolling events, the State contends that Boyd's speedy trial rights were not violated. While Boyd acknowledges that time was tolled during several periods for which Boyd's counsel had requested continuances, he contends that not all of the time during which the motion to suppress was pending should be treated as tolling speedy trial time. In essence, Boyd argues that the trial court took an unreasonable amount of time to issue a decision on his motion after the

submission of all evidence to the court, which amounted to a violation of his statutory speedy trial rights.

{¶ 19} The parties agree that the time between January 2, 2021, and January 28, 2021, was charged to the State. This accounted for 26 days of speedy trial time, as the day of arrest is not included in the calculation. *State v. Cimpaye*, 2020-Ohio-2740, 154 N.E.3d 415, ¶ 17 (2d Dist.). Between January 28 and March 4, 2021, Boyd requested several continuances, filed for discovery, requested a bill of particulars, and requested preservation of evidence. Both parties agree that this time was tolled and not charged to the State.

{¶ 20} On March 4, 2021, Boyd filed a motion to suppress. While both parties agree with the general proposition that the filing of a motion to suppress tolls time, Boyd contends that the time it took the trial court to render a decision on the motion was unreasonable, such that the entirety of the length of time it took to render a decision should not be tolled. If the entirety of the time that the motion to suppress was pending were tolled, there would be no speedy trial violation. However, if not all of the time were tolled, Boyd's speedy trial rights might have been violated.

{¶ 21} The Ohio Supreme Court has held that a trial court does not have "unbridled discretion concerning the amount of time it takes to rule on a defense motion. * * * A strict adherence to the spirit of the speedy trial statutes requires a trial judge, in the sound exercise of his judicial discretion, to rule on these motions in as expeditious a manner as possible." *State v. Martin*, 56 Ohio St.2d 289, 297, 384 N.E.2d 239 (1978). The amount of time taken to render a decision on a defendant's motion to suppress must be

reasonable in light of all the circumstances. *State v. Taylor*, 2d Dist. Montgomery No. 14456, 1995 WL 680052, *12 (Nov. 17, 1995). There is no bright line rule with respect to what constitutes a reasonable amount of time to render a decision on a motion to suppress. Rather, a reviewing court must carefully examine the record and consider the particular "facts and circumstances of each case." *Id.*, quoting *State v. McDaniel*, 4th Dist. Meigs No. 94CA08, 1995 WL 75394, *3 (Feb. 21, 1995). The complexity of the facts and the difficulty of the legal issues, in addition to the constraints of a trial judge's docket, must be considered.

**{¶ 22}** Boyd filed his first motion to suppress on March 4, 2021, and a supplemental motion in April 2021; the trial court overruled Boyd's motions on December 21, 2021. While the amount of time the trial court took to render a decision was lengthy, we recognize several factors that cause us to conclude that the entirety of the time Boyd's motions were pending was chargeable to him for speedy trial purposes.

**{¶ 23}** A hearing was originally scheduled on Boyd's March 4, 2021 motion fairly quickly, but the hearing was continued, which allowed Boyd to file a second motion to suppress on April 20, 2021. After the second motion was filed, the parties continued the hearing date again until May 14, 2021. A hearing on the motions was held on May 14, 2021. However, at the conclusion of the State's presentation of evidence, Boyd's counsel requested an additional hearing date to have a defense witness testify. Thus, the hearing was continued until June 2, 2021. The defense witness did not appear for the June 2, 2021 hearing, and the case was continued again on behalf of Boyd to June 17, 2021. Although it is unclear from the record why no hearing went forward on June

17, 2021, it was certainly not unreasonable for the trial court to have continued the case in order for Boyd to obtain a witness, even if no witness eventually testified. Thereafter, both parties filed post-hearing briefs; the State filed on July 20, 2021, and Boyd filed on August 6, 2021.

**{¶ 24}** Additionally, Boyd filed a motion for bond review during the pendency of the motions and a hearing on bond was held on June 2, 2021. Although no decision was filed, presumably the trial court denied the motion as there was no change of bond conditions during the remainder of the case. *See State v. Alltop*, 2d Dist. Montgomery No. 24324, 2011-Ohio-5541, ¶ 18 (where a trial court proceeds to judgment without ruling on a pending motion, it is presumed the motion has been denied).

**{¶ 25}** Another hearing was held on September 23, 2021, at which point the trial court indicated that defense counsel had requested a continuance until October 14, 2021. This was also reflected in a written motion for a continuance that was signed and filed by defense counsel the previous day. According to the trial court, it agreed to hold off on issuing a decision on the motions to suppress at the request of defense counsel in order for the parties to work on a resolution. We are aware that the trial court indicated it had set the September 23, 2021 hearing date in order to render a decision on the motions to suppress. However, subsequent statements by the trial court reflected that it was still working on writing the final decision. On November 10, 2021, the trial court scheduled Boyd's final pretrial and jury trial dates. The trial court also stated that it would be issuing a "decision on the motion to suppress shortly." Supp. Tr. at p. 3. Notably, the trial court later explained that, at the November 10, 2021 hearing, "we wanted to secure that date

[for trial] *even though I was not quite finished with the motion to suppress – or the motion to suppress' decision*." (Emphasis added.) Hrg. Tr. p. 133. It has long been held that a trial court speaks only through its journal entry. *State v. King*, 70 Ohio St.3d 158, 162, 637 N.E.2d 903 (1994). Thus, where a trial court has yet to deliver judgment, the court's decision is not yet final, and the court is not precluded from modifying its decision prior to rendering a final entry.

{¶ 26} Further, this case involved multiple serious felony charges and a co-defendant, which made the case relatively complex. The decision on the motion to suppress was 17 pages long and dealt with complicated legal issues, as demonstrated by our discussion of Boyd's second assignment of error, below, wherein Boyd challenged the trial court's rulings on his motions to suppress. Considering the several extensions of time made at Boyd's request and the need for the trial court to thoroughly research and contemplate the issues raised by Boyd's motions, the amount of time taken by the trial court in ruling on the motions was reasonable. Based on the record before us, we conclude that the entirety of the time taken to rule on Boyd's motions to suppress was not charged to the State.

{¶ 27} When the trial court issued its decision on Boyd's motions, the speedy trial clock restarted. On January 24, 2022, Boyd filed a motion to dismiss based on a speedy trial violation, which constituted a tolling event and stopped the clock. *Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, at ¶ 28; R.C. 2945.72(E). Therefore, between December 21, 2021, when the trial court issued its decision on the motions to suppress, and January 24, 2022, when Boyd filed his motion to dismiss, 34 days were

charged to the State. At that point, a total of 60 days of speedy trial time was chargeable to the State, leaving an additional 30 days left to bring Boyd to trial. The trial court overruled Boyd's motion to dismiss on January 25, 2022, and Boyd entered his no contest pleas immediately thereafter. Thus, no additional time was charged to the State after the decision was rendered on Boyd's motion to dismiss.

{¶ 28} Based on our calculations, the State had 30 days left as of January 25, 2022, to try Boyd within the speedy trial time. Because Boyd entered a plea before that time ended, no statutory speedy trial violation occurred, and the trial court correctly overruled his motion to dismiss.

### b. Constitutional Speedy Trial

{¶ 29} Boyd's second argument under this assignment of error is that he was denied his constitutional right to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution and by Section 10, Article I of the Ohio Constitution. We do not agree.

{¶ 30} " 'The Sixth Amendment right to a speedy trial is * * * not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.' " *State v. Triplett*, 78 Ohio St.3d 566, 568, 679 N.E.2d 290 (1997), quoting *United States v. MacDonald*, 456 U.S. 1, 8, 102 S.Ct.

1497, 71 L.Ed.2d 696 (1982).

{¶ 31} "[T]he Supreme Court set forth a balancing test that considers the following factors to determine whether trial delays are reasonable under the Sixth and Fourteenth Amendments to the United States Constitution: 'Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.' " *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 38, quoting *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). "[T]hese four factors are balanced considering the totality of the circumstances, with no one factor controlling." *State v. Perkins*, 2d Dist. Clark No. 2008-CA-81, 2009-Ohio-3033, ¶ 8, citing *Barker*.

{¶ 32} Under the first *Barker* factor, the "length of the delay is to some extent a triggering mechanism." *Barker* at 530. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* If the delay is not presumptively prejudicial, courts need not engage in the balancing test. *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 89. "A delay becomes presumptively prejudicial as it approaches one year in length." *Id.* at ¶ 90, citing *Doggett v. United States*, 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), fn. 1.

{¶ 33} Boyd was arrested on January 2, 2021, and entered no contest pleas on January 25, 2022. Generally, as a case approaches the one-year mark, the delay is enough to trigger the *Barker* inquiry. However, cases involving serious charges with complex issues allow for more delay than "an ordinary street crime." *Barker* at 531. Furthermore, "[b]efore calculating any delay in proceeding to trial, the court must subtract

the part of the delay attributable to the defendant." *State v. Anderson*, 7th Dist. Columbiana No. 2002 CO 30, 2003-Ohio-2557, ¶ 17, citing *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 65-66.

**{¶ 34}** Here, Boyd was charged with two counts of trafficking in persons and one count of aggravated possession of drugs, all of which were first-degree felonies requiring mandatory prison time. He was also charged with one count of corrupting another with drugs, a felony of the second degree, which required mandatory prison; three counts of having weapons while under disability, felonies of the third degree; aggravated menacing and assault, both misdemeanors of the first degree; and one count of sale to underage persons, an unclassified misdemeanor. Additionally, this case involved a co-defendant who was also charged with first- and second-degree felonies. Finally, the delay of just over 12 months was not inordinately long considering that the majority of the delay was the result of Boyd's own actions. After subtracting those parts of the delay attributable to Boyd, the time between his arrest and his pleas was only 60 days. We cannot conclude under these circumstances that the delay was presumptively prejudicial to trigger a *Barker* analysis. For this reason alone, Boyd's constitutional speedy trial challenge must be rejected. Nevertheless, we will consider the remaining *Barker* factors.

**{¶ 35}** The second factor to consider is the reason for the delay. "Only the portion of the delay which is attributed to the government's neglect is to be weighed in a defendant's favor." *Triplett*, 78 Ohio St.3d at 569, 679 N.E.2d 290, citing *Doggett*, 505 U.S. at 658, 112 S.Ct. 2686, 120 L.Ed.2d 520. As we previously addressed, the entirety of the time it took for the trial court to rule on Boyd's motions was reasonable under the

circumstances of this case. Thus, of the 387 days that elapsed, only 60 days were attributable to the State. This factor weighed heavily against Boyd.

{¶ 36} The third *Barker* factor is the defendant's assertion of his right to a speedy trial. *Barker* at 530. As the Supreme Court of Ohio explained:

It is well established under our law that the right to a speedy trial conferred by the Constitution is not self-executing. Affirmative action on the part of an accused in the nature of a demand to be tried is necessary to invoke the protection of the Constitution. * * * In other words, there can be no denial where there has been no demand. The purpose of Section 10, Article I, is to provide a trial for an accused without undue delay with its attendant anxieties and the possibility that the defense might be prejudiced by the lapse of time. However, it was not intended as a shield to the guilty, the protection of which might be invoked by sitting silently back and allowing the prosecution to believe that the accused is acquiescing in the delay. It is a right which must be claimed or it will be held to have been waived.

(Citations omitted.) *Partsch v. Haskins*, 175 Ohio St. 139, 140, 191 N.E.2d 922 (1963).

{¶ 37} Here the record before us does not reflect any assertion by Boyd of his speedy-trial right prior to the filing of his motion to dismiss on speedy-trial grounds. Boyd did not object to the trial court's scheduling of the case at any time, including the time leading up to the January 31, 2022 trial date. Notably, Boyd appeared in court for a final pretrial hearing on January 20, 2022, and the only concern he had at that time was making sure he received a response to his request for a bill of particulars. After the State filed a

bill of particulars, Boyd filed his motion to dismiss on January 24, 2022, one week prior to trial and the night before he entered his no-contest pleas. Therefore, the third *Barker* factor weighed against finding a constitutional speedy-trial violation.

{¶ 38} Lastly, Boyd did not establish any prejudice resulting from the delay. "In *Barker*, the court stated that prejudice should be evaluated in light of three interests that the speedy trial right is intended to protect: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.' " *State v. Lewis*, 2d Dist. Montgomery No. 28962, 2021-Ohio-1895, ¶ 78, quoting *Barker*, 407 U.S. at 532, 92 S.Ct. 2182, 33 L.Ed.2d 101. However, Boyd never specified in the trial court or on appeal how he was prejudiced, and there was no evidence in the record to suggest that Boyd was prejudiced, such as a witness's death or evidence that become unavailable owing to the delay. *Barker* at 534. Consequently, this factor did not weigh against the State for constitutional speedy-trial analysis.

{¶ 39} Considering each of the *Barker* factors, the trial court did not err in denying Boyd's motion to dismiss for a constitutional speedy trial violation.

### c. State's Burden

{¶ 40} Finally, Boyd contends that the State did not respond to his motion to dismiss and therefore never met its burden of production. Boyd relies on *State v. Butcher*, 27 Ohio St.3d 28, 500 N.E.2d 1368 (1986), to allege that once a defendant makes a prima facie case of a speedy trial violation, the burden of production shifts to the

State to establish justification for the extension of speedy trial time. Boyd contends that the failure of the State to produce sufficient evidence to extend the speedy trial time necessitates reversal.

{¶ 41} In *Butcher*, the defendant filed a motion for dismissal alleging that he had not been afforded a speedy trial because he had remained in jail since the date of his arraignment "solely on this pending cause." *Id.* at 30. Due to the length of time Butcher was held, absent him being held on multiple offenses, his speedy trial time had expired. At the oral hearing on the motion, the State alleged that Butcher was not being held solely on the charge in the indictment, but was also being held on several other charges, such that Butcher was not entitled to the triple-count provision of R.C. 2945.71(E). *Id.* However, the Court found that the State had failed to document its position by producing records demonstrating that Butcher was not entitled to the triple-count provision. *Id.* Absent any evidence to demonstrate that Butcher was not entitled to the triple count provision, the Court concluded that Butcher's speedy trial rights had been violated. *Id.*

{¶ 42} While it is true that the State did not respond to Boyd's motion, this case is distinguishable from the situation in *Butcher*. Boyd's case was scheduled for a plea hearing the day after Boyd filed his motion. The record reflects that Boyd's motion to dismiss was filed at 5:37 p.m. on January 24, 2022, which was after the close of business. The parties appeared in court on January 25, 2022, at 11:06 a.m. for a plea hearing. Hrg. Tr. at p. 111. Immediately preceding Boyd's entering his no contest pleas, the trial court explained its reasons for overruling his motion to dismiss; the trial court relied on the dates in the docket entries available to the trial court, of which it could take judicial

notice. *See Davenport v. Big Bros. & Big Sisters of Greater Miami Valley, Inc.*, 2d Dist. Montgomery No. 23659, 2010-Ohio-2503, ¶ 24 ("A court certainly may take judicial notice of the record and proceedings in the case before it."). A review of the docket demonstrated on its face that Boyd's motion was without merit. Consequently, there was no need for the State to present any explanation or documentation from outside the record for the delay. Furthermore, Boyd never objected to the time calculations or the manner in which the hearing occurred. Under these circumstances, we find that the State's failure to respond did not necessitate a dismissal on speedy trial grounds.

{¶ 43} Having found no statutory or constitutional speedy trial violation, we overrule Boyd's first assignment of error.

### III. Motion to Suppress

{¶ 44} In his second assignment of error, Boyd contends that the trial court abused its discretion in overruling his motion to suppress evidence. Boyd first argues that no exigent circumstances existed for law enforcement to permissibly enter his residence without a warrant. But he further contends that, even if there had been exigent circumstances, the only emergency was Boyd's presence, which was resolved by his arrest, such that no protective sweep was permitted. Finally, Boyd claims that any evidence confiscated from his home should have been excluded because the seizure of any evidence from within was the result of an unconstitutional search.

### a. Motion to Suppress Facts

{¶ 45} Evidence from the motion to suppress hearing established the following. Dayton Police Officers Scott Myers and George Kloos were dispatched to a crash

investigation on Kensington Avenue in Dayton on the afternoon of January 1, 2021. A caller had complained of damage to their storage POD, which appeared to have been struck by a car. The officers observed a license plate bracket and vehicle track marks in the front yard, which led them to the neighbor's home, which was Boyd's residence. When the officers knocked on Boyd's door, a female answered the door and claimed that Boyd was her uncle. Eventually, Boyd came outside and inquired about the vehicle track marks in his yard. A truck in Boyd's front yard sat in line with the tracks, and the license plate bracket officers found in the neighbor's yard matched the truck. Based on the evidence, it appeared that the truck at Boyd's house had crashed into the neighbor's POD. The officers completed a non-investigative traffic crash report about the incident. They did not arrest Boyd and did not inquire further about the female who had answered the door. During their interaction with Boyd, he had glossy eyes and an odor of alcoholic beverage coming from his breath.

{¶ 46} In the early morning hours of January 2, 2021, Dayton Police Officers Matthew Brown and Zachariah Hastings responded to a request for a welfare check on two juveniles at Boyd's home; the request was made by an administrator of a group home in Clayton, Ohio. No one answered the door at Boyd's home so, after receiving permission from their supervisor, the officers went to the group home in Clayton to further investigate. After speaking to 14-year-old R.H., Dayton Police Detective John Howard, who was assigned to human trafficking investigations, was asked to assist. R.H. reported to the officers that she and two other juveniles, B.H. and M.H., had run away from the group home on the night of December 31, 2020; they had gotten a ride from a

man who provided them with alcohol and then drove them to Boyd's home. The juveniles were also given alcohol and marijuana at Boyd's home. R.H. also informed the officers that the two other teenage runaways were still inside Boyd's home on Kensington and were under the influence of narcotics. According to R.H., she believed the marijuana they had been given had been laced with something, because the other two girls had been hallucinating, shaking, and convulsing as if they were having seizures. Based on the reactions of the other two girls, R.H. did not consume any of the alcohol or drugs at Boyd's home.

{¶ 47} R.H. recounted that, during the night of December 31, 2020, into the morning of January 1, 2021, Boyd had taken R.H. outside into the backyard, held her hand around a handgun, and discharged several rounds into the air. R.H. advised that she had observed multiple firearms in the house, but specifically on the table inside the front room of the home. R.H. also informed police that she believed B.H. had engaged in sexual activity with Boyd in the back bedroom, after which Boyd gave B.H. $100 for the sex act. Although the girls had lied about their ages, claiming to be either 17 or 18 years old, they were only 14 and 15 years old at the time. Boyd was 43 years old.

{¶ 48} During the day of January 1, 2021, R.H. said that the girls took Boyd's car keys while he was passed out in the back bedroom, got into Boyd's truck to go shopping, and then crashed the truck into a POD container located in the next-door neighbor's yard. When the police arrived, B.H. answered the door, and they woke up Boyd so that he could speak to the police. After the police left, Boyd hit B.H., knocked her to the ground, and pointed a gun at her. Boyd pointed the gun to the back of B.H.'s head and her lower

back area. Boyd informed the juveniles that they would have to engage in sexual activity with friends, sell drugs, or "do cam" to pay for the damages to the car. To "do cam" meant performing on an online streaming service where individuals undress and/or do sexual acts on themselves or others for money.

{¶ 49} On the night of January 1, 2021, R.H. left Boyd's house while he was passed out again in the back bedroom. R.H. explained that she was fearful of Boyd for herself and for the other girls. R.H. tried to get the other two girls to leave with her, but they refused. After R.H. left, she contacted her biological mother, who contacted the police and took her to the emergency room; she was treated and released. R.H. was then returned to the group home, where she told the police what had transpired.

{¶ 50} After speaking with R.H., officers learned from another female juvenile at the group home that a social media account belonging to B.H. was contacting people and inviting them to the Kensington address. B.H.'s account asked for people to come "hang out and smoke." A juvenile male from the group home obtained Boyd's address on Kensington through B.H.'s social media account. It was not known whether B.H. or M.H. had a cell phone, but Boyd was known to have a cell phone. Both B.H. and M.H. had been reported missing by the administrator of the group home.

{¶ 51} After learning of the situation from R.H., officers contemplated initiating a SWAT call-out for a potential hostage rescue, forcing entry into the home and recovering the juveniles, or knocking on the door to make contact with Boyd and then going into the home to get the girls. The officers elected the last option as the least intrusive means and the least likely to cause violence.

{¶ 52} Because they had been involved in the traffic crash incident previously, Officers Myers and Kloos were informed that there was a situation at Boyd's home involving missing juveniles and possible human trafficking, and they were asked to contact Boyd.   Around 7 a.m., Officer Myers knocked on Boyd's front door and called out to Boyd to come talk to them.   About 5-10 minutes later, Boyd came to the door and stepped out onto the front porch.   Although the testimony seemed to reflect that Boyd had closed the door upon exiting the house, it was unclear if he had also locked the door. In any event, the officers handcuffed Boyd and patted him down before taking him to the rear seat of a police cruiser.   During the pat down, officers recovered Boyd's house keys.

{¶ 53} After Boyd was secured, officers entered Boyd's home searching for the juveniles that were believed to still be inside.   The officers located B.H. and M.H. inside the home; they were partially unclothed and under the influence of drugs.   While inside the home, officers observed a gun sitting on a table.

{¶ 54} After removing the girls from the home and taking them to Dayton Children's Hospital, officers stayed on the scene to secure the home until the detectives obtained a search warrant.   The search warrant was signed at 1:45 p.m. on January 2, 2021. During the execution of the search warrant, several firearms and drugs were recovered from inside Boyd's home.

### b.  Motion to Suppress Standards

{¶ 55} "Appellate review of a motion to suppress presents a mixed question of law and fact."   *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. In considering a motion to suppress, "the trial court assumes the role of trier of facts and

is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E .2d 321 (2d Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

### c. Exigent Circumstances

{¶ 56} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures. *State v. Orr*, 91 Ohio St.3d 389, 391, 745 N.E.2d 1036 (2001). "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), citing *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Thus, "[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Id.*, citing *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Evidence that is obtained in violation of the Fourth Amendment is inadmissible in a criminal prosecution. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

{¶ 57} "It is well-settled that warrantless searches are 'per se unreasonable under

the Fourth Amendment subject only to a few specifically established and well-delineated exceptions.' " *State v. Kessler*, 53 Ohio St.2d 204, 207, 373 N.E.2d 1252 (1978), quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454-455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Katz* at 357. "Exigent circumstances are a well-established exception to the Fourth Amendment's warrant requirement." (Citations omitted.) *State v. Lam*, 2015-Ohio-4293, 46 N.E.3d 138, ¶ 12 (2d Dist.). "The exigent or emergency circumstances exception to the warrant requirement applies in a variety of situations, including when entry into a building is necessary to protect or preserve life, to prevent physical harm to persons or property, or to prevent the concealment or destruction of evidence, or when officers are in 'hot pursuit' of a fleeing suspect or someone inside poses a danger to the police officer's safety." *State v. Byrd*, 2d Dist. Montgomery No. 27340, 2017-Ohio-6903, ¶ 13. "Whether exigent circumstances are present is determined through an objective test that looks at the totality of the circumstances confronting the police officers at the time of the entry." *State v. Enyart*, 10th Dist. Franklin Nos. 08AP-184, 08AP-318, 2010-Ohio-5623, ¶ 21, citing *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir.1990). The State bears the burden of establishing the validity of the search that was undertaken in the absence of a warrant. *Kessler* at 207.

**{¶ 58}** The trial court found that exigent circumstances justified law enforcement's entry into Boyd's home for two reasons. First, a protective sweep was reasonable and necessary. Second, the emergency aid exception applied. While both justifications fall under the umbrella category of "exigent circumstances," the two justifications are distinct.

**{¶ 59}** "A 'protective sweep' is a quick and limited search of premises, incident to

an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). "Although a protective sweep of a residence often occurs following a suspect's arrest, it also may occur when a suspect merely has been detained." *State v. Koon*, 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 14, citing *State v. Young*, 2d Dist. Montgomery No. 24537, 2011-Ohio-4875, ¶ 22. Nevertheless, "[i]n order for officers to undertake a protective sweep of an area, 'they must articulate facts that would warrant a reasonably prudent officer to believe that the area to be swept harbored an individual posing a danger to those on the scene.' " *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 189, quoting *United States v. Biggs*, 70 F.3d 913, 915 (6th Cir.1995). In other words, for the protective sweep exception to apply, "there must be some positive indication that another person or persons remain in the residential premises where a subject is arrested and that they pose a threat to the safety of officers or others." *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960, ¶ 46 (2d Dist.).

**{¶ 60}** Unlike a protective sweep, where there is a concern that someone inside the home poses a danger to police or others on scene, the emergency aid/community caretaking exception applies in situations where police have reason to believe that someone inside the home needs immediate aid. " 'Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.' " *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964

N.E.2d 1037, ¶ 18, quoting *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id.*, quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963). "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). "However, the warrantless entry and search must be limited in duration and scope to the purpose justifying that intrusion, including only that which is necessary to alleviate the emergency and the dangers associated therewith." *State v. Overholser*, 2d Dist. Clark No. 1996-CA-73, 1997 WL 451473, *2 (July 25, 1997), citing *Mincey*.

{¶ 61} Considering the totality of the circumstances in this case, we conclude that the officers acted under objectively reasonable exigent circumstances to enter Boyd's home out of concern for the safety of the two missing juveniles. Thus, under the emergency aid exception, officers lawfully entered Boyd's home.

{¶ 62} Initially, police responded to a welfare check on two juveniles. However, the investigation led to the discovery of a situation involving two missing juveniles who had been provided drugs and alcohol, one of whom had been assaulted and threatened with a gun to the back of the head, and who had been told they had to either sell drugs or themselves in order to pay Boyd for the damage to his car.

{¶ 63} R.H. informed police that Boyd had supplied the girls with alcohol and marijuana, which she believed had been laced with something. After the other two girls

ingested what Boyd provided, they hallucinated, shook, and convulsed as if they were having seizures. R.H. further described to police that she had personally observed several firearms throughout Boyd's house. Boyd had put a gun in R.H.'s hand to shoot off rounds into the air outside, and he had also used a gun later to threaten B.H. after the girls crashed his car. Boyd had pointed the gun at B.H.'s head, hit her, and knocked her to the ground.

{¶ 64} R.H. told police that, prior to the car crash incident, she believed B.H. had had sex with Boyd in the back bedroom, and he had given B.H. $100 in exchange. After the crash, however, Boyd told the girls they would have to sell drugs or themselves to pay him back. R.H. was able to escape from Boyd's home while he was passed out; she left out of concern for her safety and that of the other girls. Although she tried to get the other girls to leave with her, they refused.

{¶ 65} The information from R.H. was corroborated to the extent that officers had taken a report on Boyd's crashed vehicle, the two girls R.H. had been with had been declared missing, and B.H.'s social media account was inviting people over to Boyd's house to "hang out and smoke." While it was unknown whether B.H. or M.H. had a cell phone, it was known that Boyd had a cell phone.

{¶ 66} The information gathered from R.H. and others reasonably demonstrated that the missing juveniles potentially had been injured by the consumption of illegal substances or by Boyd himself or had been engaged in illicit sexual activities at Boyd's direction. When officers initially tried to make contact for the welfare check at Boyd's home, no one answered the door. Likewise, when police knocked on the door and

announced themselves around 7 a.m. in the morning, it took Boyd 5-10 minutes to answer the door. B.H.'s social media account had been inviting people over to "hang out and smoke" just before police arrived, indicating that B.H., and likely M.H., were still inside the home, along with anyone else who may have answered the social media offer.

{¶ 67} Upon entering the home, the officers limited their search to looking in places in which a person might reasonably be located. Although they observed contraband in plain sight, they did not collect anything or conduct any further search of the premises. Upon recovering the girls and checking their conditions, the police immediately exited Boyd's home and secured the residence while waiting to obtain a search warrant. Under these circumstances, we cannot say that the officers' entry into Boyd's home was unreasonable.

{¶ 68} Boyd disputes the necessity of the officers' entering his home, because M.H. and B.H. had not been physically prevented from leaving the home, had been able to voluntarily leave the home to go shopping, and had refused to leave when R.H. voluntarily left. The fact that the girls had been able to leave to go shopping before they crashed Boyd's car was somewhat immaterial, as his threats with the gun and orders to prostitute themselves were made after the crash occurred. Likewise, although M.H. and B.H. declined to leave when R.H. left, R.H. had been the only one not consuming drugs or alcohol, and she had been concerned for her own safety and the safety of the other girls. Moreover, as Detective Howard explained, it is not uncommon for trafficking victims to not think of themselves as victims or to not see that they are in a dangerous situation. The teens were supplied with alcohol, drugs, and money by Boyd so that he

could take advantage of them. Boyd had physically assaulted B.H. and threatened her with a gun. The girls had observed several guns inside the house, and Boyd had also discharged one, demonstrating that the gun was operable. Particularly considering that the missing girls had ingested alcohol and drugs with significant negative reactions, that Boyd had ordered them to sell drugs and prostitute themselves for money, and that B.H.'s social media account was inviting people over to "hang out and smoke" immediately prior to the officers' entering Boyd's home, it was reasonable for officers to have had significant concern for the safety and well-being of the girls and to have reasonably believed they were still inside Boyd's home.

{¶ 69} Although Boyd argues that no exigent circumstances existed to justify the warrantless entry into his home, he primarily bases his argument on the allegation that there was no risk of danger to the police or others because he was arrested outside the home. While the police must articulate facts that would warrant a reasonably prudent officer's belief that the area to be swept harbored an individual posing a threat to the safety of police or others under the protective sweep analysis, this is not part of the analysis for the emergency aid exception. If the police had a lawful justification for making the warrantless entry under the emergency aid exception, we need not consider alternative justifications.

{¶ 70} Finally, Boyd challenges the validity of the search warrant that was obtained after the officers had entered his home to locate the juveniles. His argument centers around the claim that, because the initial warrantless entry into the home was unconstitutional, then any information learned as a result of that unlawful entry tainted the

search warrant to the degree that any evidence found in his home should have been suppressed. This is because "evidence obtained in a warrantless search is generally inadmissible, and under the 'fruit of the poisonous tree' doctrine, such evidence cannot serve as probable cause to support a subsequent warrant." *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988), citing *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), citing *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Thus, generally, for the search warrant to be valid, the initial warrantless entry must have been justified.

{¶ 71} Because we have concluded that the warrantless entry in this case was lawful, any observations the police made while inside Boyd's home could have been used to obtain the subsequent search warrant. Consequently, any evidence collected pursuant to the execution of the search warrant was admissible, and the trial court did not err in overruling Boyd's motion to suppress in its entirety. Boyd's second assignment of error is overruled.

## IV. Conclusion

{¶ 72} Having overruled both of Boyd's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.